UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA )<br> )<br>v. )<br> )<br>THOMAS ULLMAN )<br> )<br> ) | Hon. Anne M. Nardacci<br>U.S. District Court Judge<br>Case No. 23-CR-412-001 |

**SENTENCING MEMORANDUM AND MOTION FOR A VARIANCE**

**Preliminary Statement**

Thomas Ullman comes before this court for sentencing following his waiver of indictment and plea of guilty pursuant to a plea agreement to an information charging one count of sexual exploitation of a child, in violation of 18 U.S.C. §2251(a), based upon Mr. Ullman's internet-based interactions with and inducements of V-1, a 15-year-old female, to transmit sexually explicit visual depictions of V-1 to Mr. Ullman.

Mr. Ullman is a 47-year-old man who is known by to those closest to him as a wonderful person who is caring and considerate and generous to others. Between 2020 and 2021, he engaged in abhorrent conduct that bears no resemblance to how he lived his life before that. While communicating in social media spaces on the internet, he ultimately pursued interactions with teenage minor females while posing as a teenage male, inducing teenage females to transmit sexually explicit images to him. He understands the seriousness of his conduct and that it calls for a severe sentence. What constitutes a sufficiently severe sentence—accounting for appropriate considerations of proportionality and considering Mr. Ullman's background and his potential for rehabilitation—is what remains to be litigated here.

1

The government seeks a guideline sentence of 30 years, the statutory maximum imprisonment for the offense of conviction, which, if imposed, could effectively be a life sentence for Mr. Ullman.  Mr. Ullman asks the Court to impose a sentence of 15 years imprisonment, consistent with the mandatory minimum term of imprisonment in this case, which, by any reasonable standard, would be a sentence of extraordinary duration in a case in which no one died and in which Mr. Ullman had no physical contact with any person.  A sentence of 15 years as a variance is warranted when the guidelines recommend a sentence of absurd severity.

The enumerated factors under §3553(a) support the imposition of a sentence of 15 years imprisonment followed by a lengthy term of supervised release.  Those factors here include the nature and circumstances of the offense—conduct exclusively over the internet with teenage minors unknown to Mr. Ullman—viewed along the broad spectrum of conduct chargeable under the statute at issue; Mr. Ullman's lack of history of in-person inappropriate sexual contacts or even attempts to have such contacts with any person; Mr. Ullman's immediate and unwavering acknowledgment of wrongdoing, his clear recognition of his need for help and his cooperativeness in the resolution of the case; and the opinion of Jacqueline Bashkoff, Ph.D., a forensic psychologist who has evaluated Mr. Ullman, that Mr. Ullman is a low-moderate risk to reoffend and low risk to society, a risk that would be further reduced by sex offender treatment and by Mr. Ullman's age by the time of his completion of a sentence of 15 years imprisonment.

A substantial variance also is necessary to avoid unwarranted disparities in similar cases. The Sentencing Commission's own study of data in cases with similar circumstances reflects that average sentences in such cases are substantially below the recommended guideline here.

I.  **MR. ULLMAN'S POSITION ON THE PSR.**

Mr. Ullman has no objections to the sentencing guideline computation in the PSR, although he contends here that the computation recommends a sentence that is far greater than necessary to serve the purposes of sentencing.

Mr. Ullman's clarifications of certain factual matters are set forth in counsel's correspondence to the U.S. Probation Office, attached here as Exhibit 1, which are likely to be incorporated in an addendum to the PSR.

II. **THE COURT SHOULD IMPOSE A SENTENCE OF 180 MONTHS IN LIGHT OF ALL OF THE FACTORS UNDER 18 U.S.C. §3553(a) AND TAKING INTO ACCOUNT THE STATUTORY MINIMUM.**

   A. *History and Characteristics of Thomas Ullman, and the Nature and Circumstances of the Offense.*

*Personal history:*

Thomas Ullman was born and raised in Schenectady to loving, hard-working parents. His father was a blue-collar factory worker. His mother, once a Catholic nun, pursued a career as a teacher before marrying Thomas's father. Mr. Ullman grew up with one older brother, Stephen, with whom he was very close. The family suffered through a later-term miscarriage and the passing of another brother soon after birth.

Mr. Ullman's upbringing was nurturing and supportive. His parents set a good example: work hard, be kind and respectful to others, be accountable for your actions. Prior to his involvement in the events underlying this case, Mr. Ullman did his best to follow that example.

He was a decent student, graduating from high school in 1995 and then attending the College of St. Joseph in Rutland, Vermont where he received a bachelor's degree in human services in 1999. Although Mr. Ullman was consistently employed thereafter, he was never prosperous, working in relatively low-paying positions at Rehabilitation Support Services, then at a hotel chain, and then as a full-time laborer for a plumbing and heating company.

Mr. Ullman was married once. After a five-year relationship, he and his now-ex-wife were married in 2005 before separating in 2010 and divorcing in 2011. Mr. Ullman has no children from that marriage or from any other relationship. Although he and his ex-wife tried to have children, they could not, which eventually contributed to strife that led to the dissolution of the marriage. After the divorce, Mr. Ullman remained on good terms with his ex-wife and continued to help her around her home when she needed.

Mr. Ullman's involvement with the criminal justice system has been limited to two convictions for drinking and driving. The first was a DWAI traffic infraction in 2012, and the second was a DWI misdemeanor in 2016 (PSR ¶¶54 and 55). He has no other prior arrests.

Mr. Ullman's alcohol use over his adult life has been occasional or sporadic. The 2012 and 2016 charges arose during times of stress surrounding acute parental health concerns during his parents' later years. He otherwise has never engaged in the problematic use of alcohol. Mr. Ullman has never engaged in the problematic use of use of marijuana or any use of other illegal or unprescribed controlled substances.

Mr. Ullman suffers from high blood pressure, for which he is medicated. He was diagnosed with depression shortly before he met his ex-wife. He took medication for that during the latter part of the marriage. For the ten years prior to this arrest, he did not receive mental health treatment, which likely was necessary and would have been helpful, but Mr. Ullman could not pay for treatment due to the lack of health insurance. He sought counseling from his priest. Prospectively, Mr. Ullman is fully receptive to mental health treatment and agrees he needs it.

Mr. Ullman has absolutely no history of violence or acting out in the community in any way. Mr. Ullman has absolutely no history of engaging in, or even attempting to engage in, inappropriate sexual contact with any other person.

4

Letters provided by individuals closest to Mr. Ullman reveal that he is a good and decent person.[1]  In addition to recounting some of the family's significant life events, Mr. Ullman's brother, Stephen, describes Thomas's commitment to his parents and to Stephen and Stephen's family.  Stephen describes how, after the loss of their father and in their mother's final year of life before her passing in May of 2021, their mother suffered from serious medical problems and eventually dementia.  Thomas became her nightly primary care giver during that last year, sleeping on the couch at her assisted living facility and feeding, cleaning and clothing her.  Stephen describes how hard their mother's decline was on Thomas, which certainly might have affected his descent into darker activities on the internet.

Marianne Zarelli, the sister of Mr. Ullman's mother, who has been like a second mother to Mr. Ullman, describes Mr. Ullman as "a loving, caring and kind individual" who would offer to help anyone and who would always be there when needed.  Regarding his care for his mother, she describes that Mr. Ullman "took extremely good care of her which proves he was a dedicated son and a very reliable, dependable and trustworthy person."

Mr. Ullman's good friend from college, Ronald Heywood, describes Mr. Ullman's accomplishments and good deeds in college and his concern for the well-being of others, that "He has a kind heart and is giving to a fault," and that "he is sincerely trying to get help [and] is remorseful for what has happened."

*Offense conduct:*

Mr. Ullman's offending conduct flowed from his pursuit of social interactions on the internet during an extended period of loneliness.  Eventually, during the year leading to his arrest, he engaged in interactions online that were criminal.  He pursued sexual communications

---

[1] Letters submitted on Mr. Ullman's behalf by Stephen Ullman, Marianne Zarelli and Ronald Heywood will be filed separately by ECF, pursuant to Court rules.

with teenage minor females around 15 years old while he posed as an 18-year-old male. He admits that he had such contacts approximately 200 times. On many occasions, he induced a teenage girl to send him sexually explicit images or to live-stream sexually explicit conduct.

Police detected that conduct and, on June 16, 2021, executed a search warrant at Mr. Ullman's home and interviewed him. Mr. Ullman freely interacted with the two primary investigators and answered their questions. He was informed early in the interaction that he was free to go and that he was under no obligation to speak to the investigators. He chose to speak freely to them. He was informed by one of the agents that he could have a lawyer, and he said he did not want a lawyer. He truthfully informed the agents about his interactions with V-1. He consented to allow the agents into his home, to look around, to locate his electronic devices. He provided his identifying information, including his phone number email address used during online communications.

He consented to accompany agents to a law enforcement office to submit to a polygraph examination. There, he was advised of Miranda warnings and of the right to refuse to submit to the polygraph. He waived all those rights and submitted to the polygraph. By the end of the interaction with police that day, Mr. Ullman had fully incriminated himself regarding all his wrongdoing. He did so while fully expressing his disgust with himself. His disclosures to police were unmistakably remorseful. He blamed no one but himself.

He agreed to allow the investigating polygraph interviewer to write a statement to be attributed to Mr. Ullman. Full of remorse and self-loathing, there was no characterization of himself that the investigator could suggest for inclusion in the statement that Mr. Ullman thought was out of bounds. He agreed to be characterized in the most despicable way. He did that not

because he is without capacity for redemption but because, in the moment, he believed he deserved nothing but scorn and to be distained and ostracized.

Mr. Ullman's prosecution commenced immediately. Upon Mr. Ullman's initial appearance in the case (which was defense counsel's first involvement with Mr. Ullman), he immediately expressed his intention to be cooperative in the resolution of the case. He conceded that his conduct was indefensible and that he would plead guilty.

Ultimately, in a case with extraordinarily severe potential sentencing exposure, Mr. Ullman waived the right to pursue pretrial litigation. He chose to waive his right to indictment and pleaded guilty to the information proposed and drafted by the prosecutor. The only delay in the process resulted from defense counsel's desire to conduct adequate review of documentary discovery and audio and video recordings and forensic extractions and then to conduct a full discussion with the government regarding the ultimate pre-indictment disposition.

Mr. Ullman fully understands the seriousness of his misconduct and its effects. His remorse continues undiminished since his first expression of remorse to the investigators on day one. As much as any person defense counsel has represented, Mr. Ullman has accepted that he deserves severe punishment, that he needs to pay a significant price and to undergo intensive rehabilitation before he might be allowed to return to the community. He is fully receptive to sex offender treatment in the Bureau of Prisons and after he is released, should he be so lucky.

*The forensic psychological evaluation of Thomas Ullman:*

Thomas Ullman submitted to a specialized and comprehensive psychological evaluation by Jacqueline Bashkoff, Ph.D. Dr. Bashkoff is fully credentialed and qualified to conduct psychological evaluations of sex offenders and individuals suspected to have sexual behavior problems and to render opinions regarding an individual's risk to offend/reoffend and

susceptibility to risk-reducing treatment. Dr. Bashkoff's report of her evaluation of Mr. Ullman is attached hereto as Exhibit 2.

Dr. Bashkoff conducted the MMPI-2, the widely used personality inventory. On validity measures, Mr. Ullman's profile was "valid", meaning he answered test questions truthfully and did not try to fake being overly virtuous or to fake illness. That finding allows for the conclusion that Mr. Ullman's performance on another psychological instrument was also valid.

Dr. Bashkoff conducted the STABLE-2007 instrument to assess likelihood of recidivism. That instrument assesses "13 well-established factors that have been shown to correlate with sexual recidivism." Exhibit 2 at p. 3 of 8. According to Dr. Bashkoff, "Overall, on the STABLE-2007, Mr. Ullman scored a 4 placing him in the low-moderate range to reoffend a same or similar behavior and low risk to society." Exhibit 2 at p. 7 of 8.

Dr. Bashkoff found it significant that Mr. Ullman "was very transparent and revealed many details of his crime," that "[h]e expressed a lot of remorse for the victims and for his family," that "[h]e stated, 'this is not who I want to be.'" Dr. Bashkoff stated Mr. Ullman "could best be described as a hebephile and not a pedophile because of the targeted age group." Exhibit 2 at p. 3 of 8.

Further, Dr. Bashkoff observed that "Mr. Ullman had no cognitive distortions or wrongly held beliefs about his illegal behavior. He did not rationalize or justify the elements of his crime. He did not project blame onto anyone else or minimize the seriousness for the victims or other collateral damage." *Id.*

In post-report conversations with defense counsel, Dr. Bashkoff has made clear that Mr. Ullman's low-moderate risk to engage in similar conduct in the future can be reduced by sex offender treatment. That conclusion is consistent with scientific studies, including the

Department of Justice's own study, which reflects that sex offender treatment "can reduce sexual recidivism over a 5-year period by 5–8 percent." Sex Offender Management Assessment and Planning Initiative, Chapter 7: Effectiveness of Treatment for Adult Sex Offenders, found at https://smart.ojp.gov/somapi/chapter-7-effectiveness-treatment-adult-sex-offenders.

Importantly in this case, Mr. Ullman's risk to reoffend in a similar way would be further reduced when, on supervised release following any term of imprisonment, he will be subject to limitations on access to and use of computers and electronic devices. He likely will never have access to an unmonitored electronic device or computer ever again. Such restrictions and supervision would practically eliminate the risk of reoffending in a similar way.

> **B.     The Court should exercise its power to vary from the applicable guideline when it was enacted without empirical justification and when it would yield a sentence which fails to take into account the statutory sentencing factors.**

Properly computed sentencing guidelines here recommend an astoundingly severe sentence. The Court should grant a variance "because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations… [and] because the case warrants a different sentence regardless." *See*, *United States v. Rita*, 551 U.S. 338, 351 (2007).

The Supreme Court in *Kimbrough* stated that a sentencing court is empowered to impose a non-guidelines sentence in a particular case "based solely on policy considerations, including disagreements with the [Sentencing] Guidelines." *United States v. Kimbrough*, 552 U.S. 85, 101-102, 128 S.Ct. 558, 570 (2007). The Second Circuit has clarified that "a district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses." *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir.2008).

In *Spears*, the Supreme Court clarified *Kimbrough's* holding that where, as here, a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role" (i.e. the enactment of a severe guideline offense level or enhancement <u>without</u> empirical justification), the Court may categorically reject a guideline even in a "mine-run" case. *Spears v. United States*, 555 U.S. 261, 264, 129 S. Ct. 840, 843 (2009).  Here, insofar as U.S.S.G. §2G2.1 reflects the Commission's departure from its empirical approach in arriving at guidelines in general, the Court has the authority to conclude that a guideline sentence yields a "greater than necessary" sentence without the presence of factors taking a case out of the heartland. *Id.* at 842-844.

The Second Circuit in *Dorvee* addressed the application of a similar guideline, U.S.S.G. §2G2.2, applicable to cases involving the distribution, receipt and possession of child pornography.  That guideline, like §2G2.1, evolved to its current form notwithstanding the Sentencing Commission's failure to use an empirical approach in formulating the guidelines, resulting in a guideline which recommends in the vast majority of cases guidelines sentences near, at, or even over the statutory maximum.  In *Dorvee*, the Second Circuit made the observation, which is equally applicable to U.S.S.G. §2G2.1, that

> By concentrating all offenders at or near the statutory maximum, [the guideline] eviscerates the fundamental statutory requirement in § 3553(a) that district courts consider "the nature and circumstances of the offense and the history and characteristics of the defendant" and violates the principle, reinforced in *Gall,* that courts must guard against unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct.

*United States v. Dorvee*, 616 F.3d 174, 187 (2d Cir. 2010), *reh'g en banc denied*.

The evolution of §2G2.1 with incremental-to-drastic increases in offense-level severity over time—not based upon empirical study but instead in response to Congressional directive and to track increased statutory minimum sentences—tracks that of §2G2.2.  Prior to September

10

of 1996, the statutory range of imprisonment for a first-time violation of 18 U.S.C. §2251 was 0 to 10 years.  Exhibit 3-001 to -002 (Historical versions of 18 U.S.C. §2251).  In September of 1996, the statutory range increased from 0 to 10 years to 10 to 20 years.  Exhibit 3-003 to -004.  In 2003, the statutory range was increased to its current state, 15 to 30 years.  Exhibit 3-005 to -006.  The same statutes which brought about the statutory sentencing increases, particularly the PROTECT Act of 2003, either specifically directed the Sentencing Commission to add offense level enhancements or prompted the Sentencing Commission, without the exercise of its expert institutional function through empirical study, to increase base offense levels and enhancements to keep pace with increasing mandatory minimum sentences.  The Sentencing Commission did not determine through empirical study that preexisting guideline sentencing options were somehow insufficient to serve a purpose of sentencing.

The 2004 Amendments to the Sentencing Guidelines specifically explained that the evolving guideline was predominantly the direct result or at least a byproduct of Congressional directive, amended so that the guideline would match newly severe statutory ranges, not because of studied necessity for guidelines increases:

> [S]ection 103 of the PROTECT Act increased the mandatory minimum term of imprisonment from 10 to 15 years for offenses related to the production of child pornography under 18 U.S.C. § 2251. In response, the amendment increases the base offense level at § 2G2.1 (Sexually Exploiting a Minor by Production of Sexually Explicit Visual or Printed Material; Custodian Permitting Minor to Engage in Sexually Explicit Conduct; Advertisement for Minors to Engage in Production) from level 27 to level 32. A base offense level of level 32 is appropriate for production offenses because, combined with the application of several specific offense characteristics that are expected to apply in almost all production cases (e.g., age of the victim), this base offense level will ensure that the 15 year mandatory minimum (180 months) will be met in by the Chapter Two calculations almost every case.

U.S.S.G. App. C, 2004 Amendments.

The Sentencing Commission's 2012 study of the guidelines applicable in child pornography cases discussed that evolution and its effects, including the fact that average prison sentences in production cases had increased four-fold from 1992 to 2010. *See*, U.S.S.C. Report to the Congress: Federal Child Pornography Offenses, Dec. 2012 (Chapter 9), p. 268, found at https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf. That four-fold increase was not the product of studies establishing that the increase was necessary to serve the purposes of sentencing.

Judge Pooler of the Court of Appeals for the Second Circuit observed the obvious flaws in §2G2.1 and the unsupportable sentences generated by that guideline in her dissenting opinion in *United States v. Brown*, 843 F.3d 74, 88-93 (2d Cir. 2016). She noted

> the *Dorvee* court's criticism of the child pornography guidelines applies to the guidelines for production offenses as well. As with the guidelines for trafficking in child pornography found in §2G2.2, the Sentencing Commission did not use an empirical approach to develop the production guidelines found in Section 2G2.1.

*Id.* at 89.

Judge Pooler highlighted the draconian nature of sentencing recommendations under §2G2.1, which routinely recommend sentences at or above the 30-year statutory maximum for a violation of 18 U.S.C. §2251. She noted that the same conduct, if prosecuted under New York law (N.Y. Penal Law §263.10, promoting and obscene sexual performance by a child), would trigger a maximum term of imprisonment of seven years. *Id.* at 88. Judge Pooler emphasized the Supreme Court's recognition of the fundamental problem with imposing a sentence consistent with a murder conviction in non-murder cases:

> As the Supreme Court has recognized,

> There is a line between homicide and other serious violent offenses against the individual. Serious nonhomicide crimes may be devastating in their harm[,] but in terms of moral depravity and of the injury to the person and to the public, they cannot be compared to murder in their severity and irrevocability. This is because life is over for the victim of the murderer, but for the victim of even a very serious nonhomicide crime, life is not over and normally is not beyond repair. Although an offense like robbery or rape is a serious crime deserving serious punishment, those crimes differ from homicide crimes in a moral sense.
>
> *Graham v. Florida*, 560 U.S. 48, 69, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010) (citations, alterations, and internal quotation marks omitted). Although Brown's crimes "differ from homicide crimes in a moral sense," he received the same sentence as a murderer. He received a sentence that "deprives [him] of the most basic liberties without giving hope for restoration." *Id.* at 69–70, 130 S.Ct. 2011. It is a sentence that "means denial of hope," that "good behavior and character improvement are immaterial," that "whatever the future might hold in store for the mind and spirit ..., [he] will remain in prison for the rest of his days." *Id.* at 70, 130 S.Ct. 2011 (alterations and internal quotation marks omitted).

*Id.* at 92-93.

The sentencing ranges recommended from routine application of §2G2.1, typically at or near the §2251 statutory maximum of 30 years, simply do not make sense when conduct that is objectively more severe and deserving of greater punishment is routinely punished with drastically lower sentences. The Sentencing Commission's 2012 Report to the Congress: Federal Child Pornography Offenses, listed the following offenses that resulted in lower sentences than the ranges recommended for child pornography offenses under §2G2.2 (sentences which, incidentally, are lower than the 30-year plus sentence commonly recommended by §2G2.1): forcible rape of a child, forcible prostitution of a child, travel to engage in sex with a child, sexual assault of a child, and statutory rape. The Commission reported the following mean sentences (for all criminal history categories and offenders) for those crimes in federal courts:

- 230 months for forcible rape of pre-pubescent children;
- 173 months for raping a pubescent child;
- 155 months for forcibly prostituting children;

13

- 104 months for travel to engage in sex with a child 12 or older;
- 46 months for sexual assault of a child; and
- 37 months for statutory rape.

2012 Report to the Congress: Federal Child Pornography Offenses, p. 137, Table 6-6, found at https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf.  That Mr. Ullman's offense might be punishable under the guidelines far more severely than some or all of those listed offenses does not make sense.

The Sentencing Commission's more recent study, Federal Sentencing of Child Pornography:  Production Offenses (October 13, 2021), establishes that, country-wide, guideline sentences in production cases have become the exception to the rule.  Based on the Commission's study, Courts' treatment of 2G2.1 offenders throughout the country over time reflects the judiciary's rejection of the strict application of §2G2.1 in favor of downward variances:

> Trends from Fiscal Years 2005 – 2019 The percentage of child pornography production offenders sentenced below the guideline range has changed over time (Figure 9, next page). The rate of within-range sentences for offenders sentenced under §2G2.1 has decreased steadily since fiscal year 2005, from 83.3 percent to 30.7 percent in fiscal year 2019. This change is driven largely by an increase in the rate of downward variances during that time, from 16.7 percent in fiscal year 2005 to a peak of 57.2 percent in fiscal year 2019.

Federal Sentencing of Child Pornography:  Production Offenses (October 13, 2021) at p. 22, found at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20211013_Production-CP.pdf.

That study showed that for the latest period studied, production offenders received an average sentence of 275 months, *Id.* at p. 3, which is substantially below the guideline sentence sought here by the government.  Further, the study examined the effect of certain specific factors

14

on sentencing outcomes, such as:

- proximity between the offender and victim:

**Table 7. Offender Location and Sentence Length**
*Fiscal Year 2019*

| Offender Presence | N | Mean Sentence |
|---|---|---|
| Total §2G2.1 Offenders | 512 | 275 |
| Offender Was Present | 311 | 302 |
| Offender Was Not Present | 201 | 234 |

;

- whether there was a family or other relationship, versus an anonymous internet relationship:

**Table 8. Select Offender and Victim Relationships and Sentence Length**
*Fiscal Year 2019*

| Relationship to Victim | N | Mean Sentence |
|---|---|---|
| Total §2G2.1 Offenders | 512 | 275 |
| Parent | 93 | 340 |
| Other Relative | 60 | 304 |
| Teacher, Coach, etc. | 37 | 274 |
| Internet Stranger | 181 | 249 |

- the age of the victim:

**Table 9. Age of the Youngest Production Victim and Sentence Length**
*Fiscal Year 2019*

| Age of Youngest Victim | N | Mean Sentence |
|---|---|---|
| Total §2G2.1 Offenders | 512 | 275 |
| Infant | 26 | 364 |
| Toddler | 58 | 330 |
| Prepubescent | 223 | 292 |
| Teenager | 194 | 232 |

15

- whether there was physical contact between the offender and victim or if the victim engaged in contact with her/himself;

Table 10. Sexual Contact During Production and Sentence Length
Fiscal Year 2019

| Level of Contact | N | Mean Sentence |
|---|---|---|
| Total §2G2.1 Offenders | 512 | 275 |
| Offender or co-participant sexually contacted a victim | 285 | 307 |
| Victim(s) engaged in sexual contact | 129 | 244 |
| No sexual contact | 98 | 221 |

Regarding each of those factors, the corresponding facts in Mr. Ullman's case all would support sentences substantially below 30 years.

Mr. Ullman's case presents a clear example in which the guidelines would recommend an astoundingly severe sentence—30 years—when Mr. Ullman's case does not present nearly the most severely aggravating circumstances to support that recommendation. Although Mr. Ullman's conduct was abhorrent, inducing the transmission of sexually explicit images over the internet using the misrepresentation of his identity, he nevertheless was never physically present with a victim, and never tried to be. He never had actual physical contact with a victim. The victims were in their mid-teens and not actually known to Mr. Ullman. Mr. Ullman did not distribute any images of child pornography.

A case in which a perpetrator engaged in actual, physical sexual contact with a prepubescent victim, when the perpetrator was a parent or family member of the victim and who engaged in repeated acts of in-person sexual contact with the victim over months or years, and when the perpetrator distributed images over the internet for money, would be objectively more

serious and deserving of greater punishment. Under §2K2.1, though, that person would score exactly the same as Mr. Ullman. That makes no sense.

A sentence that might effectively be life imprisonment in this case establishes a clear defect in the guidelines when they allow no more-severe sentences for individuals whose conduct would be far more aggravating.

Further, if a sentence of 15 years is imposed, Mr. Ullman would leave prison after he is 55 years old, putting him at an age when is unlikely to reoffend. The risk of recidivism decreases steadily and substantially with age. *See*, *Recidivism Among Federal Offenders: A Comprehensive Overview*, at 23 (U.S. Sentencing Commission March 2016); *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 12, 16, 28 (U.S. Sentencing Commission May 2004). On the correlation between age and recidivism, one court said

> One can only reasonably assume that the trend of decreasing recidivism continues downward after the age of 50. Under the guidelines, the age of the offender is not ordinarily relevant in determining the sentence. *See*, §5H1.1. But under §3553(a)(2)(C), the age of the offender is plainly relevant to the issue of "protect[ing] the public from further crimes of the defendant."

*United States v. Nellum*, 2005 WL 300073, *3 (N.D. Ind. 2005). Mr. Ullman will present much less of a danger to reoffend even if he is sentenced at the mandatory minimum.

**CONCLUSION**

Mr. Ullman's conduct was purely internet-based and involved teenage minors, which are factors that courts around the country recognize support sentences substantially below the applicable guidelines arising from the inherently flawed U.S.S.G. §2G2.1. Mr. Ullman immediately admitted his wrongdoing and expressed his clear remorse to the law enforcement who first encountered him. His conduct since his arrest and leading up to the imminent

sentencing is consistent with his desire to accept full accountability for conduct which he appreciates is morally reprehensible. At the same time, Mr. Ullman has no history of in-person inappropriate sexual contacts or even attempts to have such contacts with any person. Dr. Bashkoff's opinion is that Mr. Ullman is a low-moderate risk to reoffend in a similar way and low risk to act out in the community, which would be further reduced by Mr. Ullman's participation in sex offender treatment, to which he is fully receptive. Any risk to engage in similar internet-based conduct can be practically eliminated post-imprisonment considering Mr. Ullman is likely to never be allowed to have unmonitored computer use going forward.

Accordingly, the Court should decline to impose a sentence at the 30-year statutory maximum for the charge in the information, which would be absurdly high and disproportionate to Mr. Ullman's culpable conduct. Instead, the Court should grant a variance from the guidelines and impose a sentence of 15 years imprisonment, which would incapacitate Mr. Ullman for an extraordinarily long time, followed by a lengthy period of supervised release.

Date: March 16, 2024                               LISA PEEBLES
                                                   Federal Public Defender


                                        By:   /s/Timothy E. Austin
                                              Timothy E. Austin
                                              Bar Roll No. 508098
                                              Assistant Federal Public Defender
                                              54 State Street, Suite 310
                                              Albany, New York 12207
                                              Tel: (518) 436-1850
                                              Fax: (518) 436-1780
                                              Email: tim_austin@fd.org

To:   United States District Court Clerk
      Katherine E. Kopita, Esq., AUSA
      Kristin L. Bent, USPO

**CERTIFICATE OF SERVICE**

I, Timothy E. Austin, Esq., hereby certify that on March 16, 2024, I filed the foregoing Sentencing Memorandum and Motion for a Variance, with exhibits, by ECF, which sent notification to

    AUSA Katherine E. Kopita

and I served the same upon USPO Kristin L. Bent by email to Kristin_Bent@nynp.uscourts.gov.

                                      LISA PEEBLES
                                      Federal Public Defender

By:    */s/Timothy E. Austin*
           Timothy E. Austin
           Bar Roll No. 508098
           Assistant Federal Public Defender
           54 State Street, Suite 310
           Albany, New York 12207
           Tel:  (518) 436-1850
           Fax: (518) 436-1780
           Email: tim_austin@fd.org